♪ Which side of these 18 units is the input? Your Honor, it is what you've said. It's line drawing. When there is no low-voltage event, the 36 transistors perform the function of the inverter, and the input comes into those transistors. When there's a low-voltage event, those switch, and they take the current that's coming in and run it to ground so it never reaches the other 18. And they are performing two functions depending upon what event is occurring. But you know two things, Your Honor. You know first that those 18 transistors are coupled to the input of the inverter because that's where the current is coming in. If they weren't coupled to the input, they couldn't run the current to ground. We also know that they're capable of drawing the current off of the rotor generator and drawing that to ground so that although the rotor generator is generating the current, it's never reaching two places. It's never reaching those 18 transistors. It's also not reaching the grid-side inverter, which is also a separate inverter. And the court may... I asked you a question about the word from and the current from, and I hate to blatantly show my ignorance, but my electrical engineering background is from a vacuum tube era, and you'll forgive me, but even in those days, we knew what alternating current was. That at the input of the inverter, it's AC, alternating current. So it's going back and forth. It's not going in one direction, is it? No, it's alternating current. So what does it mean shunting current from the inverter? I think, Your Honor, in the context of this patent, he's talking about the current that's coming to the inverter, to the input of the inverter, which is the location, and it's shunting it, it's taking it to ground. And this is the current from the rotor. This is the current from the rotor generator, and that's why I think in response to Chief Judge Rader's question, it cannot be that current can never reach that component which you're shunting from because this claim specifically requires that you shunt from two locations, one of which is the location generating the current. Now, the patent works, the systems that we both have work, because the crowbar circuit does shunt from both, and as a consequence, you never get to either the grid-side inverter or the 18 transistors on the generator-side inverter. And the couple to the input of the inverter makes sense if you take, I mean, Your Honor's electrical engineering is more than mine, but if you take the claim at its word, the couple to the input of the inverter makes sense. The input of the inverter is a little bit like a door. You can be coupled on the outside, you can be coupled on the inside, just as long as you can keep things from getting out into the room. You can be coupled at the entry to the intersection with a roadblock, or you can divert traffic when it gets in. But I think if the court considers that analogy of diverting traffic and considers the claim itself and the requirement that you be diverting or shunting from two locations, Judge Charneski's claim interpretation makes sense and his resolution makes sense. Let me use just a minute of my rebuttal time to address the second patent. And let me just say this. The claim term is predetermined value. The commission adopted a claim interpretation that was the road recurrent or an adequate proxy. But as this court has seen in many cases, there are times when judicial bodies interpret the claim interpretation. And what has happened here is there has been an interpretation of the claim interpretation so that the claim interpretation that was in fact applied is different than the one articulated. And that's why it's a de novo issue for this court. The ITC took the claim interpretation or the word adequate proxy and then applied it with these words, guaranteed one-to-one relationship or universal one-to-one relationship. They are not the same. The claim interpretation that was in fact applied was a guaranteed universal one-to-one relationship. That is incorrect claim interpretation. In fact, Judge Charneski's claim interpretation was correct. And for that reason, the commission's opinion on that patent should be set aside and at least remanded. And I'll save the rest of my time for rebuttal if I could. Thank you, Mr. Lee. The court will restore Mr. Lee's entire time. Would you give an additional minute to both Mr. Wirth and Mr. Dunner, and that will keep our time even on both sides. Mr. Wirth, that gives you six minutes. Good morning and may it please the court. The central issue with respect to the 985 patent is whether the shunting from limitation can be satisfied by shunting from only part of the inverter. We submit the answer is no for three reasons. First, claim 15 uses the inverter throughout the claim to refer to the whole inverter. There are about five instances of the inverter. And the 18 transistors that play the role in the GE device of shunting current, those are part of the inverter? Yes, Your Honor. That's consistent with the claimed use of the inverter to refer to the entire inverter. They don't simply precede the inverter. They are part of and play a role in converting AC to DC. I think Your Honor has asked a very important question, which really puts its finger on the heart of the case. That's why I asked. When that shunt circuit is in operation, there is no inverting going on by that part of the inverter. So from a functional standpoint, at that moment in time, it is not part of the inverter. And that's, I think, why Your Honor was saying there's an arbitrary aspect in that regard. On the other hand, the claim language is clear that the inverter refers to and is used to refer to the entire inverter. That is consistent with the specification, as GE itself admits. And I think tellingly, a person of ordinary skill in the art would understand that the inverter refers to and means the entire inverter. That's A4152. So you can't say that those 18 transistors are simply located in a box or located at a physical place that's related to the inverter but are separate from. They are part of the inverter. Yes, Your Honor. And play a role in converting current from AC to DC. Yes. Functionally, they function as an inverter the rest of the time during normal operation. They need to be protected. The claim speaks in anatomical terms of the entire inverter. That's the specification that a person of ordinary skill in the art would understand the need to protect the entire inverter. And the only reason that the GE device can withstand, the GE switches can withstand that higher current, and those are switches inside the inverter, is because GE uses twice the number of switches. Is this an advance in the art? Is GE actually invented a stronger circuit that is what we might characterize as after a rising technology? Yes, Your Honor. I think Mr. Dunner is going to talk to that more. There is a separate patent, the 036 patent on that. And I would like to clarify that in our brief. Let me ask you one other question as your time expires here. Doesn't the current have to reach the rotor generator in order for it to shunt from? Okay, I'm glad you asked that, because that goes to Mr. Lee's point about what is shunting. And the shunt circuit is doing two things. We agree with that. But we disagree about what those two things are. The shunt circuit is dissipating the high current. And I think that's the primary function of a crowbar circuit or a shunt circuit. You have high current. It's dangerous. You need to dissipate it. And so you send it off somewhere else. The second thing is that it's preventing that from reaching the inverter, which is what really needs to be protected. Now, as Judge Lynn pointed out, current is bidirectional. It can flow in either direction. The claim is drafted to the emergency situation where current is flowing from the rotor to the inverter. And you can see that the shunt is, it says in the claim, the shunt receives current from the rotor. The shunt is coupled to the input of the inverter. So it's really speaking about the situation where it's flowing from the rotor to the inverter. But there's a very nice diagram that Mitsubishi had at trial which shows that it's really deflecting current that can come in either direction in operation. I want to clarify in our brief when we talk about— Let me just address that. If the shunt can function to ground current and coming from both directions, then the current that's in the inverter would be shunted in the GE device, would it not? Current from the inverter would be shunted? I believe the answer is yes, although I think that the record did not focus on that point. But if that's true, then wasn't the administrative judge correct? I think the key is the claim language. And that's what we keep coming back to, that the inverter is used in claim 15 to refer to the entire inverter. And the switches of the inverter in the GE device are being exposed to high current. It's the entire inverter because the claim says it's coupled to the input of the inverter. Each of the times it says having an inverter, as you said, coupled to receive power, in the inverter, of the inverter, from the inverter, that each time it says the inverter, as a matter of antecedent basis, it is talking about the whole inverter. Mr. Worth, your time's expired. Leave the clock off for a second. The court would like to discuss a little procedure with you. Yes, Your Honor. As you recognize the court altered the traditional time allotments for this particular argument, and you objected saying there was some great government interest at stake here, and yet you've argued nothing different than what Mr. Dunner will argue in one second about the claim construction. Please help me understand what great government interest is at stake that could not have been addressed equally by Mr. Dunner. Or that would have warranted the time requested. Yes, or would have warranted what you objected to us doing. Okay. In answering Your Honor's question, I want to thank you for the opportunity and say that we would like the opportunity in future to discuss this with the court, as it might affect future cases. Well, but this is a pretty good case to look at. Okay. I really expected after your objection that you would come and have some great insight as to why the government's interest compelled a different allotment of time. There is a melding of public and private interests, as the Supreme Court pointed out in the auto workers v. Schofield case. We are very much like the NLRB, where there's a charging party and a charged party, and the Supreme Court has explained that the private interest and the public interest both exist, and they share time at oral argument, as the Supreme Court discussed there. And if the court wishes to hear from the industry, who is actually bearing the brunt of whatever investigation you undertake, that wouldn't cause you any objection, right? Well, that's exactly it, Your Honor. If the interests are melded and they're the same, and we determine that they're the ones that feel the pain more directly and perhaps are more attuned to it than an investigating independent agency, you wouldn't object to us hearing from them, would you? Because they're representing your interest too, your melded interest. Chief Judge Rader, the United States also bears the brunt, because it is the United States Customs and Border Patrol which has to enforce our orders, and we also believe that there's a public interest in protecting domestic industry where there has been an infringement by violating importation. And there's really a strong public interest that the United States shares. I understand that, but you're arguing nothing. You argued nothing to us different from what I think we'll hear more from Mr. Dunner about in just a second. Okay, well, we would like the opportunity to continue this conversation with the court, and domestic industry is a topic. Judge, could I? Fair enough. I thought you might say something to the effect that most of the argument related to the domestic industry, because we're discussing GE. Yes, Your Honor. The infringing product is not GE's product.  Can I just clarify that in our brief? Is that a valid point to consider in the court's allocation of time? It's a very tricky subject, but domestic industry is an important aspect of what we do. We've not normally come up in an infringement context. In this particular case, as this was argued in the district court, it would be all about claim interpretation and Mitsubishi and have nothing to do with GE's product. I think we would come back to the AXO case where the court recognized that the commission is exercising a public interest and that there is enforcement by the Customs Service. Thank you, Mr. Werth. Let's hear then from Mr. Dunner, who has 16 minutes. Good morning, and may it please the court. Contrary to what Mr. Lee has said, the claims have not been restricted to the sole embodiment. It may happen that they end up covering only the sole embodiment, but that's not why they've been interpreted that way by the commission. They've been interpreted that way because the language of the claims and the specification overwhelmingly suggests the interpretation of the commission is correct. I've heard questions and answers about from. If one wanted to cover what GE is trying to cover, namely a part of the inverter itself, it never would have written the claim this way. It never would have said from shunting current from the inverter. But they had no way to anticipate that at all. This is after a rising technology. They couldn't guess that GE would invent a circuit with super-powered diodes, could they? So how could we impose on them an obligation to foresee the future? You don't have to. When a patent attorney writes claims, a patent attorney writes claims with a view toward, if the prior art permits, writing them as broadly as the prior art will permit. But you can't foresee the unforeseeable future, which is why we have a doctrine of equivalence to deal with this. Wouldn't you have expected this case to go under the DOE doctrine of equivalence? Your Honor, this case could have gone under the DOE, but GE chose to put on almost no testimony on the doctrine of equivalence. The commission found that the way was different because the way is that they have what they call a crowbar circuit. But, of course, the way difference wouldn't operate with after a rising technology. You would expect after a rising technology to have a different way. And the doctrine of equivalence accounts for that. The doctrine of equivalence was available to them. They didn't prove their case under the doctrine of equivalence for several reasons. One, they put on almost no testimony of their own witnesses. We're not saying it has to be from their own witnesses. We're not taking the position that our experts' testimony cannot be used by them. But the commission found no particularized testimony. If you look, I have collected all of the testimony on the doctrine of equivalence. It's a very small packet of paper. It's mentioned on page 24 of their grave read. And the fact is that the testimony they rely on from our witnesses is against them. It says they're not the same. They're different. Of course they're different. It's after a rising technology. And that has to be accounted for. The only place that we account for that in the patent system is with the doctrine of equivalence. And to push that aside on some technicality of particularized pleading seems to me to be error. Your Honor, it is not only particularized pleading. It is function, way, result, or substantiality. And the evidence they rely on shows there's a different function, a different way, a different result, and substantial differences. I'm not saying they're not entitled to the doctrine of equivalence. But this is a substantial evidence question, Your Honor. The commission found the doctrine of equivalence was not satisfied. That's a highly deferential issue entitled to substantial evidence review. And I'm suggesting that they're entitled to rely on the doctrine of equivalence. We're not precluding them. We're not arguing they're precluded from covering after acquired technology. We are arguing that if they want to cover after acquired technology, they've got to do one of two things. They either have to have written their claims broadly or have to rely on the doctrine of equivalence. They wrote their claims narrowly, and they don't satisfy the doctrine of equivalence. I'm not so sure it's narrow. Mr. Lee suggests to us that the coupled with the input inverter is the only place that indicates location of the crowbar circuit, that the shunt language is really just indicating its purpose. Once you've got the crowbar circuit coupled with the input of the inverter, then it performs the purpose of shunting. Why isn't he right on that? Well, he's wrong for a number of reasons. One, the claim calls for a circuit coupled with the input of the inverter and with the converter controller. And figure four, to which you directed some questions, Your Honor, shows the crowbar circuit outside of the inverter between the converter controller and the input of the inverter. Now, input does not mean that you're inside the inverter and looking out. A logical, rational interpretation of input is you're outside looking in. And in fact, the specification... Figure four is entirely diagrammatic, and it doesn't even show the direct connection between the crowbar circuit and the rotor or the input. It's just described, but not illustrated. I'm not sure how much you can derive from that diagrammatic view. Your Honor, I use that as an illustration. There's a lot more. The fact is that the patent itself describes the circuit as coupled to the generator rotor and the rotor side inverter, showing that they're between the two. The word input, I think, suggests the outside. The patent itself says, in column three, to shunt current away from the inverters. Away from the inverters. That doesn't mean that it can come from the inside, their police officer analogy. But it's only saying it's coupled to the input. That doesn't tell you where it is. It just says it's coupled. It can be before or into. It could be coupled at any point. Isn't that correct? Your Honor, I don't believe so. I think that... As long as it's coupled to, it doesn't have to be in front of it, right? As long as it's coupled. Your Honor, there are a lot of words here. I'm not relying solely on coupled to. I'm relying on coupled with the input of the inverter, suggesting to me that it comes from the outside. I'm relying on the word from the inverter, which suggests that it's shunting from the inverter, which doesn't suggest that you're shunting it away from part of the inverter. They could have used claim language very easily to cover this without any imagination into the future. When there's a low voltage event that triggers this spike of current, and the 18 transistors at GE kick in, is there any current whatsoever in any component of the inverter? Yes, there is current. There is? There is current. Is it shunted to ground? Current from the DC link or the DC bus... No, it doesn't go into the ground. We dispute that. There's current from the DC bus, which is going from right to left, and which is stopped by the other switches, which are turned off. The crowbar circuit is not what is preventing in the GE device. It is not what is preventing the current from going from the grid to the rotor. It is the switches which are turned off. In the other direction, the crowbar circuit circulates the current away from the diodes in the inverter. The fact is that this whole embodiment was distinguished in their 036 patent, which we relied on. If the 18 circuits that acted here as the shunt circuit were outside the inverter, would they satisfy the claim? If they were outside the inverter, as in the patent, yes, they would. If they were outside the inverter, and if they operated as the patent describes them operating, it would satisfy the claim. But they are inside the inverter. They are part of the inverter. They could have written a claim that said, at least part of the inverter. Or they could have used a claim, you suggested some claim language, shunt from the sensitive components. It is not foreseeable that somebody would be able to advance the art enough to make the shunting function part of the inverter, instead of sticking it an inch to the left or right. I lost your train of thought. Well, I'm back to the point where we started. You're requiring them to write a claim that anticipates an unforeseeable future. I find that a pretty difficult burden to put on anyone. Your Honor, I'm not requiring them to do that. I'm saying that's what the doctrine of equivalence is for. When somebody writes a claim too narrowly... Did somebody say that earlier? A very distinguished somebody. That's what the doctrine of equivalence is for. And they can argue the doctrine of equivalence, but I explained why the doctrine of equivalence doesn't help them. The 036 patent distinguished this patent. It said this... I don't think it mentions the patent by number, but it describes in the early part of it what this invention is. It says it's too expensive. And so what do we do? We want it inside the inverter. And how do they claim it? Within the inverter. In the inverter. Those are the words of the claim. There are lots of words they could have used. They could have had dependent claims, which said within, or they can rely on the doctrine of equivalence. All I'm saying is you've got all kinds of problems here. And there's another problem, which I haven't even mentioned, and that is that their police analogy has a problem in that you've got to shunt current from the inverter and the generator rotor. The word from has to be interpreted the same way in both cases. The current is not removed from the generator rotor by GE circuit, but it's removed by turning off the switches. So they don't even satisfy that language. They are deficient in multiple respects. By the way, on my earlier question, if the 18 switches would infringe the claim if they were moved an inch to the right or left, that means they work in the same way and there is doctrine of equivalence infringement, isn't there? You just admitted they work in the same way to get the same function they'd infringe if they were moved an inch to the left. Your Honor, it's not an inch to the left. It's outside the inverter. That's an inch to the left. Well, whether it's an inch or a ton... But the point is, you said they literally infringe at that point. It sounds to me like the same way, the same result, the same function, the same one. Not substantially, but the same one. But inside, it's not the same way. Inside, the way is going into the inverter and using switches in the inverter that normally function as part of the inverter when you're not in the short-circuit mode. So the function, way, and result analysis has to be made in light of what their invention... But your whole argument rests on location. Not function, not way, not result. You admit that. It seems to me like you admit it a little too much. You admitted it doesn't infringe. Well, Your Honor, it will be you to judge whether it's too much. I don't think it is too much because if you put it outside, the switches outside are not acting as part of the inverter. They're not part of the inverter. Whereas the switches inside are part of the inverter. And the specification, the drawings, the description, all are contrary to a conclusion that that is the same thing. And in fact, I think their 036 patent recognizes that they're very different. Their 036 patent criticizes the 785 structure as being very expensive and said, we'll do it a different way. We'll do it inside. That 036 patent is itself... Still strikes me as more placement than actual function, way, and result. It's just the location. Your Honor, I think we've gone through that issue so I don't know that I can elaborate anymore. I think the function and way are very different when it's outside as compared to when it's inside. So let me talk very briefly about the 221 patent. And I would just like to say that their entire case is based on... The heart of their case is really based on a single sentence in the specification of that patent which mentions time. The very next sentence says a preferred way, a particularly expedient way is to use a predetermined value of current. And those are not alternative embodiments of the claimed invention. One is A, the time. One is B, the predetermined value of current. The claims are all directed to B and they are mutually exclusive. And so what they're trying to do and they didn't rely on the doctrinal equivalence on appeal for that. What they're trying to do it's almost like a Johnson and Johnston situation where they have something disclosed which is basically what they don't want to do and now they're doing something else. And in fact, the evolution of GE's invention was that they considered using a value of current 1300 amps. And they found that sometimes it was 1300 sometimes it was 1100, sometimes it was 1000. And so they dropped that and they went to the DC bus or the DC link instead. They argue Ohm's law. Ohm's law doesn't apply because in fact there is no current flow between the DC bus and the rotor side inverter when it's in a short circuit mode. So you've got two different circuits the current and the voltage are not related to one another there. If in fact and moreover it is clear there's no X to Y relationship their own witness said there's no what the commission called the one to one relationship. So their proxy is not a proxy at all. And in fact the Mitsubishi device doesn't use that approach either. It uses the approach that was basically rejected in the early disclosure of that patent. Final thought for us Mr. Senator. Any final thought? No your honor. Thank you for the time. You're welcome. Mr. Lee you have your rebuttal time, five minutes. I'll be brief your honor. Four points on the 985 patent. The first is we did pursue the doctrine of equivalence on the domestic industry technical problem. And at A158 to 159 you will see that Judge Tarneski went through the evidence that demonstrated that if you applied the function way result test we satisfied it. So to the extent that Mitsubishi suggested we should have pursued that issue we did. And the person who heard the evidence found that if there was a requirement of location then and that somehow prevented a little infringement we infringed our products satisfied the limitations of the doctrine of equivalence. Second point. The 036 patent is an improvement patent. The way as the court knows you have come up with an invention the invention is what the 985 is you keep working on it you try to make it more efficient more cost efficient and one of the ways they found was to allow the sharing of these 18 transistors. It doesn't drive the claim interpretation of the earlier issued patent. Third point. Neither Mitsubishi nor the commission addressed the logical impossibility of their claim interpretation and the commission's claim interpretation given the rotor generator language. And the best indication that we can give the court that that is a problem for them is when the court considers the arguments we'd ask you to look at the MHI brief at page 21 where they show you that the line is missing from the rotor generator to the shunt circuit. That by definition has to be drawing current off something generating current. It's the only way that could make sense and it's why the police analogy makes sense. Fourth point. To go back to Judge Lynn's point earlier on about line drawing in normal operation those 18 transistors coupled with the others perform the inversion function changing from AC to DC. In the low voltage event they change function and they become the shunt circuit that prevents anything from getting to the 18 other transistors and nothing's performing the inversion function. That's why Judge Czerneski when he reached the doctrine of equivalence in fact held that if location was required we satisfied it equivalently. One point on the 2 to 1 patent and that's this. Respectfully Mr. Donner suggested we relied upon only one part of the specification that's not accurate and if we didn't communicate it clearly I'll try to do it now. He quoted column 3 lines 4 to 6 that does talk about resuming based upon a predetermined time constant and for sure that's followed by discussing a predetermined value. But at column 3 lines 37 to 40 the patent says this. Column 3 lines 37 to 40. The patent says this. When the amplitude of the rotor current has dropped off sufficiently after 100 to 200 msec milliseconds the feeding of the rotor current can be resumed on recurrence of the supply voltage within the framework of the method according to the invention. Time is used according to the invention. It is a proxy for rotor current and Judge Czerneski had that one correct as well. Thank you, Your Honor. Mr. Lee. Our next case is